Joseph Supornick v. Commissioner.
Supornick v. Commissioner
Docket No. 356.
United States Tax Court
1943 Tax Ct. Memo LEXIS 55; 2 T.C.M. (CCH) 988; T.C.M. (RIA) 43481; November 13, 1943
*55 Samuel Lipschultz, Esq., and Sydney W. Goffstein, Esq., for the petitioner. S. U. Hiken, Esq., for the respondent. VAN FOSSAN Memorandum Opinion VAN FOSSAN, Judge: The respondent determined deficiencies in petitioner's income tax for 1940 and 1941 in the respective amounts of $5,875.28 and $17,889.10. The sole question presented is whether a partnership existed during the taxable years between petitioner and his two sons, Meyer and David Supornick. The facts are as follows: [The Facts] The petitioner, now 60 years of age, resides in St. Paul, Minnesota, and filed his income tax returns for the taxable years with the collector of internal revenue for the district of Minnesota. Since 1915 petitioner's principal business has been that of adjusting fire losses as a representative of the insured. In later years he has had substantial investments in real estate and otherwise. His principal place of business was in St. Paul, Minnesota, but his activities extended into other cities and states. Prior to 1926 he carried on this work first as a partnership and later as an individual. From 1926 to 1936 he and one Hitchcock conducted the business as a partnership. In December 1936, *56 while on her death bed, petitioner's first wife said to petitioner: "I know I am going - I want you to take the boys and keep them near you. Take them in your business. I want you to teach them your business." Immediately thereafter petitioner brought about the dissolution of the partnership with Hitchcock. At the time of their mother's death, the sons, Meyer and David, were respectively 22 and 18 years of age. Meyer was working in his father's office and David was attending college. The boys had worked for their father at odd hours and in vacations since they were 14 years of age. Except for a period of six or seven months in 1938 or 1939, Meyer continued to work for his father in the adjusting business through 1939. In 1940 he worked in Macey's Store in Minneapolis. Sometime during that year he went to California where he entertained a proposition to go into business there. His father refused to furnish him the money necessary. On February 26, 1941, Meyer was officially registered as the owner of a liquor business. From May 28, 1941, to date he has been in the United States Army. David was in the Army from February 29, 1940 to August 28, 1940; also from January 2, 1941 to February *57 17, 1941, and continuously since March 2, 1942. At intermediate times during 1940 and 1941 both boys were engaged in the adjusting business. Until the end of 1939 the boys received salaries when employed by petitioner. After January 1940 they had drawing accounts with the office. In October or November 1939 petitioner called his sons into his office and said to them: "Boys, up to now I give everything that a father could give you, I give you private military school education, I pay your insurance, I give you nice home, nice rooms, clothing, I give you everything a father could give. I would like to give you a proposition. From now on, from next year, I would like to put you in as partners in my business, but it is the understanding that you put all your time in, work up in your own name the way I did. * * * You have a little money in the bank which your mother wants you to get, that I promised your mother you will get that. You are going to leave this money in the bank the way it stands, I won't touch it and it will be yours. If you prove yourself capable of handling the money without throwing it away, then, I will turn it over to both you boys after you prove to me that you are *58 doing your duty. If you prove that you are doing a good job in a few years I will turn over the entire business to you." Petitioner further stated: "From 1940 I will give you 25 per cent of any income that comes in in this office including the real estate, the insurance, but with one understanding you don't touch that money there, but you will have to take care of everything, attend to the real estate, collect the rent, see the property is taken care of in a proper way." In the course of this conversation petitioner also said: "Twenty-five per cent of the profit of my business from real estate, insurance, and adjusting will be your pay or profit if you put in all your energy and work up this in your own name. If you do make good, that is what your profit will be. * * * If you go ahead and put your energy, your head in the work, you will get 25 per cent of the profit. Now, if you do a good job I intend to retire entirely out of this, quit." The "money in the bank" referred to by petitioner in the above statement represented funds amounting to $12,000 accumulated by the mother of the two boys during a number of years. It was held in a joint account in the names of petitioner and his *59 wife until her death. Thereafter it was held in his own name. In January or February 1940 petitioner told his bookkeeper that the boys were to receive 25 per cent of all profits of the business. Sometime during that year petitioner told the accountant who prepared tax returns for the business that he had taken the boys into partnership and that they were each to get 25 per cent of the profits. The accountant's recollection was that the boys were not going to have any of the profits until they earned it. The accountant suggested that it would be necessary to have an agreement. Ten months later, or on December 31, 1940, petitioner and his sons signed the following agreement: This Agreement, Made and entered into this 31st day of December. 1940, by and between Joseph Supornick, as party of the first part. David Supornick, as party of the second part, and Meyer Supornick, as party of the third part, Witnesseth: The parties hereto have been operating under a verbal partnership since January 1st, 1940. but they deem it best for the protection of all parties concerned to enter into this partnership agreement: (1) That the parties hereto form a partnership for the transaction of the business *60 of adjusting fire losses. (2) The business of the partnership shall be conducted under the name of the party of the first part, and the office of the partnership shall be in the city of St. Paul, Minnesota. (3) The partnership shall commence on the first day of January, 1941, and shall continue for a period of two years thereafter. (4) The net profits of the partnership shall be divided among the parties hereto in the following proportions: Fifty percent (50%) thereof to the party of the first part, Twenty-five per cent (25%) thereof to the party of the second part, Twenty-five per cent (25%) thereof to the party of the third part. and the losses if any, shall be borne by the said parties in the same proportions. (5) The partners shall be allowed to draw from the business such amounts as shall be agreed to by the parties hereto hereafter, and in accordance with the earnings of the business. (6) All moneys received from the operations of the partnership business shall be deposited in such bank or banks as the parties may select, and shall be drawn out only upon checks signed by the first party, or by such other signature or manner as the parties hereto may mutually agree upon. *61 (7) Books of account shall be kept by the partners, and entries made therein of all moneys, goods, effects, debts, receipts, payments and all other transactions of the partnership. Such books of account and all other books, papers and records belonging to the partnership shall be kept at the partnership office, and shall be at all times open to the examination of the partners. (8) Whenever and as often as it shall be ascertained that there are profits arising from the partnership transactions available for distribution, there may be a distribution of such profits between the parties hereto, provided that all parties think it proper to make such distribution. (9) The parties of the second and third parts shall have no interest whatsoever in the capital of the business, and such capital shall be the sole property of the party of the first part. The only change in the ledger made as a consequence of the petitioner's statement to the bookkeeper was to change the salary accounts of the boys to drawing accounts. The principal income from the business was carried at all times in an account in petitioner's name. At the end of 1940 and of 1941 the accountant who was preparing the tax returns *62 computed the profits and told the bookkeeper what amounts to enter in the books as the shares of the profits of petitioner and the boys. Profits were not divided at any time prior to the end of 1940 and 1941. At no time during the years 1940 and 1941 was either of the petitioner's sons authorized to write checks against bank accounts maintained in the name of the petitioner. Meyer Supornick had a checking account in 1940 and 1941 in the First National Bank of St. Paul. Said account had year-end balances of $291.62 and $572.63, respectively. David Supornick had no checking account in his own name or from which he was authorized to make withdrawals during the year 1940 but had a checking account at the First National Bank of St. Paul in 1941 which had a balance at the end of said year in the amount of $3,664.48. This account was opened May 28, 1941, by deposit of a check in the amount of $5,000. This check was issued by the petitioner on May 28, 1941, to the order of David Supornick. The separate bank accounts maintained by the petitioner and by Meyer Supornick in 1940 and 1941 were the same accounts which each of them had maintained for a number of years prior thereto, and at no time *63 were any of the banks in which said accounts were carried notified by the petitioner or either of his sons that the latter had a partnership interest in the business admittedly conducted by the petitioner prior to 1940 as an individual proprietorship. The only name appearing on the outer office door and in the building directory of the office in which the business of the alleged partnership was conducted was that of the petitioner. The classified section of the St. Paul telephone directory during 1940 and 1941 listed under the heading "Adjusters" the name "Joseph Supornick" but did not list the names David Supornick, Meyer Supornick, Joseph Supornick and Sons, or any other name in which "Supornick" appeared. All checks issued in payment of the Federal income tax liability shown on the separate income tax returns of David and Meyer Supornick for each of the years 1940 and 1941 were signed by the petitioner and drawn against bank accounts maintained in his name. Meyer and David Supornick were listed as employees of the petitioner in the Minnesota State Unemployment Tax Return for 1939. They were not so listed in the 1940 return. Petitioner's bookkeeper prepared Federal Insurance *64 Contribution Returns which were filed by the petitioner with the collector of internal revenue. The petitioner's name and signature appeared as employer on all of such returns for 1940, 1941 and 1942 but amended returns for each of said years were filed by David Supornick, as office manager. In the return for 1943 for the first time the return was filed under the names of Joseph, Meyer and David Supornick and petitioner's signature is followed by the description "partner". Attached to this return is the following statement: "This business has been operated as a partnership since January 1, 1941 and is known as Joseph Supornick and Sons, 1014 Guardian Building, St. Paul, Minnesota." Partnership returns were filed for the years 1940 and 1941 showing ordinary net income of $34,211.01 and $46,674.28, respectively. The individual returns for petitioner and his two sons showed income as follows: 1940
1941
Joseph Supornick (peti-
tioner)
$17,105.51
$23,337.41
Meyer Supornick
8,552.75
11,668.71
David Supornick
8,552.75
11,668.70
In the notice of deficiency respondent determined that the income of the business for the years 1940 and 1941 constituted individual income of *65 petitioner. The respondent made certain adjustments and held that petitioner was "personally engaged in the business of insurance adjuster" and that his income was "improperly reported as a partnership * * * in the partnership return." The adjustments in petitioner's income are conceded by petitioner to be correct, leaving in issue only the question of the existence of a partnership. [Opinion] As above noted, the sole question presented by this case is whether a partnership existed between petitioner and his two sons during 1940 and 1941, - essentially a question of fact. Unquestionably petitioner, early in 1940, talked about taking his sons into partnership and later an agreement purporting on its face to create a relation of partnership was executed. However, there is more to the problem than this. Petitioner's statements must be studied to determine if they proposed a real partnership and all the pertinent evidence must be considered to ascertain if a partnership in fact was ever created. It can be agreed that petitioner desired the association of his sons in his business. Such association, however, was clearly to be conditioned on their performance. When discussing the *66 money in the bank which their mother had accumulated for them, he made it clear that they would not get it until they had proved themselves. So far as the record shows, the money is still under petitioner's control and held in the bank in his name. In discussing the proposed partnership, petitioner was similarly guarded in his commitments. Said he, "From now on, from next year, I would like to put you in as partners in my business, but it is the understanding that you put all your time in, work up in your own name the way I did." The terms of petitioner's offer to the boys and the nature of his oral commitment to them appears clearly in two other bits of evidence. Said petitioner; "From 1940 I will give you 25 per cent of any income that comes in in this office including the real estate, the insurance, but with one understanding * * *." The petitioner again stated the matter thus: "Twenty-five per cent of the profit of my business from real estate, insurance and adjusting will be your pay or profit if you put in all your energy and work up this in your own name. If you do make good, that is what your profit will be." In our opinion these quoted statements of petitioner are truly *67 revealing of his purpose and frame of mind. They indicate to us not that an oral agreement of partnership was entered into but that petitioner, in order to stimulate interest and enthusiasm on the part of the two boys, was dangling the possibility of a partnership before them, with possible ultimate ownership of the entire business. There was no clear-cut, outright offer by petitioner of a partnership presently effective nor was there an acceptance of such an offer by the boys. The offer was conditioned on performance. Even a promise of 25 per cent of petitioner's income - a mere oral assignment of income - was conditioned on making good in the business. Thus it is that in our opinion no real or bona fide partnership existed by virtue of petitioner's statements to the boys. Petitioner's loose use of the term "partnership" in various conversations with others did not create a partnership where none in fact existed. Thus we come to the written agreement which at first glance looks like an agreement of partnership. It is to be pointed out, however, that although the agreement may have been legally sufficient to create a partnership in Minnesota that fact does not determine the present *68 issue under the Federal income tax law. Earp v. Jones, 131 fged. (2d) 292, certiorari denied, 318 U.S. 764; Francis Doll, 2 T.C. 276. Almost the sole subject of the agreement is the division of profits. The agreement was to continue for two years only. It is also pertinent to note that the interpretative testimony of petitioner as to his intention in the premises and the terms of the understanding apply to the written agreement as well as to the oral understanding. On the entire record there can be no question that the commitments of petitioner were wholly contingent on performance by the boys and constituted no more than assignment of part of petitioner's income. In fact, even the assignment was conditioned. If the boys dug in, put in all their time, and made good each got 25 per cent of the profits. If they failed to do so they lost the share. When we examine the record of actual performance and the furnishing of services by the boys, we find little or no evidence in support of petitioner. The actual control of all operations and of finances was in petitioner. In 1940 the elder son, Meyer, worked at Macey's Store during *69 part of the year. He also went to California and wired his father for $10,000 to enable him to go into business there. The father refused the request but in 1941 was instrumental in starting Meyer in the liquor business in Minnesota. Since May 28, 1941 he has been in the Army. During much of 1940 and part of 1941 David was in the Army. The boys never had authority to sign checks and although there was a division of profits on the books, made on the figures furnished by the accountant who was preparing the income tax returns, there is no evidence of actual withdrawals by the boys. By the terms of the agreement they had no interest in the capital of the business. See Mead v. Commissioner, 131 Fed. (2d) 323, certiorari denied, 318 U.S. 777. Without pausing to discuss the remainder of the evidence corroborative of our conclusion and the many items of evidence inconsistent with petitioner's contention, we hold that no valid or bona fide partnership between petitioner and his two sons existed during the taxable years. Decision will be entered for the respondent.